J-S34016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| D.D.K., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| | :: | |
| APPEAL OF: M.L., MOTHER | : | No. 479 WDA 2024 |

Appeal from the Order Entered March 27, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000082-2023

BEFORE:     DUBOW, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                    **FILED: December 3, 2024**

M.L. ("Mother") appeals from the order imposed terminating her parental rights to her child, D.D.K. ("Child"). We affirm.

Child was born in December 2020 to Mother and R.K. ("Father") (collectively, "Parents"). Parents were not married but lived together. We glean the following factual history from the petition for involuntary termination of parental rights, filed by the Allegheny County Children, Youth, and Families agency ("CYF"), as well as the notes of testimony of the termination hearing.

In December 2019 — one year before Child was born —CYF became involved with this family after Child's older brother, L.,[1] presented at the hospital "with head swelling," later found to be "bilateral subdural hematomas caused by 'violent shaking.'" CYF's Petition for Involuntary Termination of

---

[*] Former Justice specially assigned to the Superior Court.

[1] The record does not indicate L.'s last name.

Parental Rights, 4/4/23 ("Termination Petition"), at unnumbered 3. Neither Mother nor Father "were able to provide an explanation for [L.'s] injuries," and a subsequent "Childline investigation . . . report was indicated as to an unknown perpetrator[, since both Parents] and various adult family members were all present at the time of the . . . injuries." *Id*. Mother was charged with endangering the welfare of a child ("EWOC"), but subsequently pleaded guilty to disorderly conduct.[2] L. was removed from Parents' care and adjudicated dependent. A half-brother, M.B., "was interviewed" and was not removed from Parents' care at this time. N.T., 3/15/24, at 118; *see also* Termination Petition at 3.

As stated above, Child was born in December 2020. Due to concerns regarding L.'s injury, CYF obtained an order for emergency protective custody, and Child was placed with his maternal aunt and uncle when he was two days old. *See* N.T., 3/15/24, at 6, 11. At a shelter care hearing, "[M]other was ordered to attend mental health treatment, medication management, sign [releases of information], and participate in in-home services." *Id*. at 11.

On February 2, 2021 — when Child was six weeks old — the trial court adjudicated him dependent and ordered his return to Parents' care, "with crisis in-home services." Trial Court Opinion, 4/5/24, at 3. However, two and one-half months later, in April 2021, Mother brought Child to the emergency room

_____

[2] The record does not indicate what sentence, if any, Mother received.

with a broken arm; she "was not present when that injury occurred." N.T., 3/15/24, at 79. "Father reported that he was doing physical therapy with [C]hild and felt his arm . . . pop [*sic*] a little bit." ***Id***. However, "[i]t was determined at the hospital that [this explanation] was not consistent with the nature of the injury." ***Id***. For this incident, Father pleaded guilty to EWOC and received a sentence of two years' probation. Trial Court Opinion, 4/5/24, at 3.

CYF obtained a second emergency order for protective custody, and on April 15, 2021, took legal custody of Child and his half-brother M.B. Child was initially placed with his maternal aunt and uncle. One month later, Child was placed with a foster parent, M.W. ("Foster Mother"), where he has remained.[3]

On April 4, 2023, CYF filed the underlying petition to terminate both Parents' parental rights. At this time, Child was two years and three months old and had been removed from Parents' care for two years. Subsequently, Father consented to the termination of his rights. On March 15, 2024, the trial court conducted a termination hearing as to Mother.

CYF Caseworker Sprague testified to the following. He has been involved with this family since December 2019, when L. suffered his injury.

_____

[3] CYF Caseworker David Sprague ("Caseworker Sprague") testified that "there was some conflict between the aunt and [Mother, Mother] made some allegations[,] and [the] aunt said she could[ not] keep [Child] anymore." N.T., 3/15/24, at 91. Initially, M.B. also lived with Foster Mother, but he was subsequently placed elsewhere due to issues between him and Child and another child in the home. ***See id***. at 42.

When Child was removed from Parents' care for the second time, in April 2021, Mother's family plan goals were to continue mental health treatment and medication management, complete a parenting program, have supervised visitation, and have "coached visitation." N.T., 3/15/24, at 79-80. CYF implemented the "Homebuilders" program — "a very intensive," thirty-day, in-home services program, aimed to "get the family . . . set up" for Child's return home. *Id*. at 80, 104. Mother successfully completed this program. *See id*. at 80-81. There were fourteen "family plan" meetings with CYF, held every three or six months, and Mother attended all of them.[4] *Id*. at 80. Subsequently, CYF added the goals of complying with alcohol and drug treatment, and obtaining stable housing and employment. We review in detail the evidence presented with respect to each goal.

First, with respect to mental health treatment, James Mercuri ("Mercuri"), a clinical social worker with St. Margaret's Family Health Center, testified to the following. He began treating Mother's mental health in 2016, and currently met with her every other week. "There have been periods of time where [Mother] kept those appointments and periods of time where she . . . lapsed from treatment, but she has always . . . reached out to reengage." N.T., 3/15/24, at 174-75. Mother is "sometimes" on time for her appointments, and they have had to reschedule "about half of the time." *Id*.

---

[4] Caseworker Sprague noted that Mother missed the family plan meeting held the day after Child was born. *See* N.T., 3/15/24, at 80.

at 181. In "recent years, [Mother] has been facing the obstacles of parenting and retaining the right to parent her child." *Id*. at 175. Their current specific goals were to work on "housing, employment, relationships[,] and treatment for depression and mood stability." *Id*. at 176. Mother's primary care physician prescribed her psychiatric medication for "depressive symptoms," which gave stability when she took them.[5] *Id*. at 177. However, Mother told Mercuri that she stopped taking the medication in July 2023 "because she did not like the side effects." *Id*. at 177, 186. Mercuri believed this has not impacted Mother's progress. *Id*. at 177. Nevertheless, Mercuri understood that Mother was using marijuana in place of medication, but he could not "recommend that . . . is an approved treatment," as it is neither medical care nor psychiatric treatment. *Id*. at 186.

With respect to alcohol and drug abuse, Caseworker Sprague testified that initially, there were no concerns, but in July 2023, Mother reported "she had been drinking continually while she was with [F]ather" but "had been sober for [thirty] days." N.T., 3/15/24, at 83. CYF thus referred Mother to POWER New Day ("Power"), a treatment program, but Mother did not complete the program.

---

[5] Mercuri and Mother's primary care physician were partners in the same practice. *See* N.T., 3/15/24, at 173-74. The notes of testimony do not indicate what the prescribed medications were. *See id*. at 194 (Mother stating she did not remember the names of her medication).

Rachel Wagner, who worked for Power, testified to the following. Power first received a referral for Mother in August 2023. Mother: underwent a drug screen, which "indicated no use;" completed a phone screening; was diagnosed with "alcohol use order, moderate;"[6] and was recommended for outpatient care. N.T., 3/15/24, at 24. Mother "accepted" this assessment, but "missed two appointments due to transportation, and then Power had to close the referral due to staffing issues." *Id*. at 24-26. Power then received a second referral for Mother in December 2023.[7] Mother again completed a phone screen, but cancelled her subsequent appointment and did not respond to attempts to reschedule. Power thus closed this referral in February 2024. In March 2024 — nine days before the termination hearing — Mother completed a third screen, which resulted in an updated alcohol use order diagnoses of "moderate in early remission," as well as a new diagnosis of "cannabis use disorder, mild." *Id*. at 29. Meanwhile, the trial court ordered Mother to submit to drug screens beginning in 2024. *See id*. at 84. Out of ten screens, Mother attended only one, which resulted in a positive test for marijuana.

---

[6] The three levels of an alcohol or substance use disorder diagnosis are "mild, moderate, and severe." N.T., 3/15/24, at 27.

[7] We note this referral, as well as Mother's subsequent March 2024 referral, arose after CYF filed the termination petition.

With respect to housing, intimate partner violence ("IPV"), and employment, Caseworker Sprague testified to the following. When Child was born, Mother and Father were living in housing obtained with the assistance of in-home services. *See* N.T., 3/15/24, at 92. At the time of Child's injury and removal from Parents' care, Mother told a CYF caseworker that she did not believe Father caused his broken arm. *See id*. at 121-22. Shortly thereafter, Parents moved into the "the paternal grandfather's home."[8] *Id*. at 92. The trial court summarized:

> In November of 2022, Mother reported to CYF that Father had hit her. Mother chose not to file a [Protection from Abuse petition.[9]] Mother was referred to the Women's Center and Shelter for [intimate partner violence ("IPV")] treatment. . . . Mother was forced to leave [the paternal grandfather's home in April 2023 and] moved around quite a bit, living with different friends for short periods of time.

Trial Court Opinion, 4/5/24, at 5. Mother completed the program at the Women's Center and Shelter in September 2023. *See* N.T., 3/15/24, at 102. Mother also worked with the "Non-Offenders program," which Caseworker Sprague believed was invovled "where there [is] concern about criminal charges for a [romantic or intimate] partner." *Id*. at 111.

In December 2023 or January 2024, Mother moved into a one-room rental with her boyfriend, M.S. *See* N.T., 3/15/24, at 87-88. In February

_____

[8] The record does not specify whether this relative was Child's paternal grandfather.

[9] *See* 23 Pa.C.S.A. § 6101-6122 (Protection from Abuse Act).

22024, CYF assessed this room, which had a bathroom and sink but a communal shower with others, and found it was not ideal for raising Child. *See id*. at 88-89. Mother "had brief periods of employment at McDonald's[ and] another restaurant at different times, but for most of [this] case, she has not been employed." *Id*. at 89.

Wayne Wilson ("Wilson"), an in-home specialist with Family Reunification Services, testified to the following. With regard to housing and employment, he began working with Mother in May 2023, visiting her at her home "[a]t least one to two times a week." N.T., 3/15/24, at 138-39. Mother was not able to obtain stable housing, and she had "a couple of days[']" employment at McDonald's in July 2023 before "she decided to leave." *Id*. at 140, 143. In October 2023, Family Reunification Services closed Mother's case "[d]ue to inconsistent participation and [an inability to] connect with her." *Id*. at 140. Mother changed her telephone number "at least three, four times," and Wilson could not contact her. *Id*. at 142.

Caseworker Sprague similarly testified that for a one month period, around October 2023, Mother changed her phone number due to issues with Father. *See* N.T., 3/15/24, at 93. However, Mother generally maintained contact with CYF. Caseworker Sprague acknowledged that Mother had been engaged in long-term mental health treatment "throughout the history of [this] case," and "for the most part, . . . was complaint with in-home" services." *Id*. at 82, 98. However, Caseworker Sprague testified that "the

underlying issues of the instability for herself continue to" exist. *Id*. at 98. Mother has not had stable employment or housing and was not able to support herself. *See id*.

With respect to parenting classes and visitation, Caseworker Sprague testified to the following. "[P]arenting was first addressed through in-home services." N.T., 3/15/24, at 81. When Child was removed from Parents' care the second time and placed with his aunt and uncle, Mother was scheduled to have twice weekly visits with Child, supervised by the aunt and uncle. *See* N.T., 3/15/24, at 91. Although CYF provided Mother was "gas cards," these "visits did not occur on a consistent basis." *Id*.

From January to March 2022, Mother attended "A Child's Place healthy parenting program," and successfully completed it. N.T., 3/15/24, at 81.

Meanwhile, in the fall of 2021, CYF referred Mother to Holy Family Institute for a "supervised coached visitation program[]," but she was discharged in September 2022 for missing five visits within a thirty-day period. N.T., 3/15/24, at 81. Fauna Allen ("Allen"), of Holy Family Institute, testified that weekly "coached visitation" with Child, for both Parents, began in October 2021. *Id*. at 128. For the remaining three months of that year, Mother attended seven visits but missed six visits. *See id*. at 129. Allen reported the following attendance for 2022: (1) in January, Mother missed two out of four visits; (2) in February — she missed three out of four visits; (3) in March — she missed four out of five visits; (4) in April — she missed

two out of four visits; (5) in May — she missed three out of five visits; (6) in June — she missed two out of four visits; (7) in July — she missed three out of four visits; (8) in August — she missed two out of five visits; and (9) in September — she missed all three visits. *See id*. At this point, Mother reached "the maximum number of missed visits in a [thirty]-day period," and thus Holy Family Institute "unsuccessfully" discharged her. *Id*. at 129-30. In sum, Holy Family Institute offered fifty-one coached visits with Child, and Mother attended twenty-one. *See id*. at 134. Mother and Father "cancel[l]ed for a variety of reasons," including transportation and illness. *Id*.

Caseworker Sprague further testified that after Child was placed with Foster Mother, Wesley Family Services ("Wesley") began supervising visits." *See* N.T., 3/15/24, at 91. These visits were generally held at Wesley's facility, although in the fall of 2022, some visits were held at Parents' home, and later at the paternal grandfather's home, when they moved there. *See id*. at 91-92. CYF provided Mother with bus passes, gas cards, and once, an Uber gift card for her to attend. *See id*. at 92-93.

Christie Ross ("Ross"), the foster care program supervisor at Wesley, testified to the following. Beginning in October 2022, Wesley supervised two hour-visits, twice a week. Parents did not attend all the visits together. Generally, the visits went "pretty well," there was affection, and Mother was "engaging." N.T., 3/15/24, at 151. However, Mother's attendance was inconsistent. *See id*. at 152. From October 2022 through May 2023, Mother

cancelled twelve visits, citing illness and transportation; Wesley also cancelled some visits. *See id*. at 153-54. Beginning around August 2023, Wesley did not hear from Mother, and she missed more than a month of visits. *See id*. at 154. From November 2023 through the termination hearing in March 2024, Mother had seventeen scheduled visits, but cancelled nine. *See id*. at 157.

Caseworker Sprague testified that Mother was also referred to Arsenal Family and Children's Center ("Arsenal") for a parenting program, but was discharged for missing too many sessions. *See* N.T., 3/15/24, at 81. Tanya Marshall ("Marshall"), who worked at Arsenal, testified to the following. Arsenal supervised visits between Mother, Child, and his half-brother M.B. over two time periods.[10] First, between February and May 2023, Mother attended five visits but cancelled seven visits. Arsenal ended these "visits due to too many cancel[l]ations." *Id*. at 17. Second, from the end of July through October 2023, Mother attended three visits but cancelled six visits. Arsenal thus "unsuccessfully discharged" Mother again due to too many cancellations. *Id*. at 17-18.

At this juncture, we note that Mother had unsupervised visits with M.B. *See* N.T., 3/15/24, at 118. Caseworker Sprague explained:

> When [L.'s injury occurred, M.B.] was interviewed and expressed no fear[,] no concerns[,] and things like that. So [M.B.] was not removed at that point. He was only removed after the

---

[10] The notes of testimony did not indicate whether Mother or Child had visits with the other sibling, L.

incident happened with [Child] and [CYF] had to document an instance of children being hurt . . . .

So that has been different, and [M.B. has] also expressed not having any fear of [Father] throughout. His visits had gone well, and because of his age and his ability to kind of care for himself a little better, he's been allowed to have unsupervised visits.

*Id*. In June 2023, CYF filed a motion, asking the trial court to grant unsupervised visits for Mother and Child, as well. However, the trial court denied that motion.

Caseworker Sprague reported that Child was diagnosed with autism in December 2023. N.T., 3/15/24, at 100. With respect to a parental bond, Caseworker Sprague testified to the following. Mother's visits with Child have gone well, and Child "appear[ed] to be somewhat . . . attached to" Mother." *Id*. at 95. Mother played with Child, changed his diapers, and attended to his needs. However, CYF was concerned the visits were inconsistent, as Mother frequently cancelled. Meanwhile, Child was bonded with and comforted by Foster Mother, and saw her "as a mother figure." *Id*. at 94.

CYF also presented Eric Bernstein, Psy.D. ("Dr. Bernstein"), a psychologist, as an expert in forensic psychology. He testified to the following. He conducted: (1) "an interactional and a bonding assessment" of Child and both Parents, in February 2023; (2) an evaluation of Child and Foster Mother, in September 2023, "when [Mother] was scheduled but did not show;" and (3) "an interactional and individual" evaluation of Child and Mother in November 2023. N.T., 3/15/24, at 33, 69. Dr. Bernstein also performed

- 12 -

psychological testing on Mother, and found she "qualified for major depressive disorder recurrent, moderate." *Id*. at 34.

Dr. Bernstein had concerns about Mother's relationship with her boyfriend, M.S., specifically "her lack of diligence in investigating someone [whom] she would like to put in a position of influence in [Child's] life. She did not know any information about his legal[,] psychiatric[,] or really overall background that would be important to consider when introducing someone as a potential caregiver." N.T., 3/15/24, at 35. Mother did "mention[] that he has [eleven] children." *Id*. at 47. Dr. Bernstein noted that, relatedly, Mother had "always denied" domestic violence with Father, as well as her alcohol abuse. *Id*. at 35. The expert witness was thus also concerned about Mother's capacity to protect Child "from people she does[ not] really know," "especially when considering that she, for a considerable period, had undergone investigation by [CYF and had] requirements to complete various goals." *Id*. at 36.

Dr. Bernstein opined that Mother and Child had a bond. He testified: "[Mother] historically has shown familiarity with [Child's] needs, and [has] meaningfully connected with him and provided him with attention and affection." N.T., 3/15/24, at 41-42. However, Dr. Bernstein also believed that Child did not rely on Mother for his everyday needs. *See id*. at 48. He stated: "[G]iven that [M]other's attendance in visits has been less than predictable and that her time with [Child] has . . . been restricted and limited,

. . . even though they may have a bond, I did not view that [C]hild is dependent on [M]other in any meaningful way such that he would be traumatized if that contact ceased in the immediate [*sic*]." ***Id***. at 47. On the other hand, Dr. Bernstein testified that Child "relied upon [Foster Mother] as his psychological parent," and "she was an invested, stable and loving caregiver committed to [Child's] well-being and needs." ***Id***. at 43.

We also review, in detail, Mother's own testimony to the following. She now believed Father caused Child's broken arm through child abuse. ***See*** N.T., 3/15/24, at 190. Mother wanted to comply with the Power program's recommendations to participate in outpatient treatment, to not use alcohol, and to "manage the marijuana use." ***Id***. at 191-92. She did not previously "follow[] through," with both Power and with the court-ordered drug screens, because of financial and "phone problems." ***Id***. at 192-93. Mother last consumed alcohol in July 2023, and stopped taking her prescribed medication about two months before the termination hearing — approximately in January 2024. ***See id***. at 192, 194. Mother "recently started using marijuana," as she "found it helpful with [her] mental health," and she talked to her primary care physician about obtaining a medical marijuana card. ***See id***. at 194.

Mother testified that she found the parenting courses helpful. N.T., 3/15/24, at 198. Additionally, she completed the program at Women's Center and Shelter and had one more session with the Non-Offenders program. ***See id***. at 200-01. Previously, Mother changed her phone number due to concerns

of domestic violence by Father, but she has notified CYF or the in-home services worker. *See id*. at 207.

Mother stated that as of the day before the termination hearing, she was no longer dating M.S., nor living in the one-room rental with him. *See* N.T., 3/15/24, at 204-05. Mother was currently staying in "a temporary place" and she would call "the HOPE [C]enter [*sic*] . . . so [she] can get in quicker." *Id*. at 204. Mother's in-home services worker told her "there were a couple [places] she had worked with before [*sic*]," and Mother would cooperate "with everything . . . to get that done as quickly as possible." *Id*. at 205-06. Mother last worked "[l]ast year sometime." *Id*. at 209. She was looking for a job, and "was supposed to do an overnight job, but they could not find a job for the bus line [*sic*]." *Id*. at 206. Mother agreed that her goals — of drug, alcohol, and mental health treatment, domestic violence treatment, housing, and parenting courses — were appropriate for her to care for Child. Mother had friends for support. *See id*. at 208.

With respect to visits and her bond with Child, Mother testified to the following. She has never cancelled "a visit just because [she did not] want to go," nor has she refused to sign a release of information. N.T., 3/15/24, at 210, 212. Mother did not have a driver's license, and relied on buses and Ubers for transportation. *See id*. at 210. CYF provided her with bus tickets and Uber cards, but the bus "only [ran] at certain times," there were sometimes road closings, and she sometimes needed to transfer buses. *Id*.

at 210-11. Mother could not attend Child's medical appointments solely; the CYF caseworker or Foster Mother must also be present; however, Mother could view Child's medical appointment schedule and appointment summary on an app. *See id*. at 213-14.

Mother testified that she understood Child's developmental needs. *See* N.T., 3/15/24, at 214. For example, at a visit two weeks before the termination hearing, Child "was not feeling well," felt "a little crabby," and "started having a meltdown." *Id*. at 217. Mother played country songs to calm him down, held him, and gave him love and affection, and Child relaxed. *See id*. at 216-17. When it was time to leave, Child again had a "meltdown," but Mother picked him up and soothed him. *Id*. at 218. Mother acknowledged that due to her lack of housing and employment, she could not presently meet Child's needs, including clothing, feeding, and bathing him, and taking him to medical appointments. *See id*. at 216. However, if Mother had housing and employment, then she could meet Child's needs. *See id*. Mother did not believe that adoption by Foster Mother was in Child's best interests. *See id*. at 223.

Subsequently, the trial court entered an order terminating Mother's parental rights under subsections 2511(a)(1), (2), (5), and (8), and (b).[11] We

---

[11] Initially, the trial court issued an order, which was: (1) dated March 15, 2024, within its text; (2) entered on the trial docket as filed as of March 18th; but (3) stamped on its face as filed as of March 20th. This order included a
*(Footnote Continued Next Page)*

reiterate that at this time, Child was three years and three months old, and had been in care all but two and one-half months of his life. Mother filed a timely notice of appeal, along with a Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal.

Mother raises the following issues for our review:

Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2)?

Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(5)?

Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8)?

Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 5.

---

typographical error — that termination was granted under subsections "(12)," (5) and (8). Subsequently, the trial court issued an amended order, which corrected the subsections to (1), (2), (5), and (8). This order: (1) was similarly dated March 15, 2024, within its text; (2) entered on the trial docket as filed as of March 27th; but (3) stamped on its face as filed as of March 28th. For ease of review, we identify the termination order by the date the amended, corrected order was entered on the trial docket as "filed" — March 27, 2024.

Additionally, we note the trial court also entered an order that confirmed Father's consent to the termination of his rights.

- 17 -

Preliminarily, we observe that Mother presents no argument concerning the trial court's termination under subsection 2511(a)(1). On this basis alone, we could affirm the termination order. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (providing this Court needs only agree with termination under any one subsection to affirm the termination of parental rights); *see also In re M.P.*, 204 A.3d 976, 981 n.2 (Pa. Super. 2019) (stating the Superior Court is an error correcting court); *In re Adoption of Z.S.H.G.*, 34 A.3d 1283, 1288 (Pa. Super. 2011) (stating we may affirm a trial court's ruling on any basis supported by the certified record). Nevertheless, as we may also affirm the termination under subsection 2511(a)(2), we set forth our analysis.

In her first issue, Mother argues the trial court erred in terminating her parental rights under subsection 2511(a)(2). When reviewing an order terminating parental rights, we:

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> . . . [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and

- 18 -

termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

**Interest of K.T.**, 324 A.3d 49, 56 (Pa. Super. 2024) (citations omitted). This Court has explained:

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

"The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." Finally, this Court need only agree with the orphans' court as to "any one subsection of [section] 2511(a), in addition to [section] 2511(b), in order to affirm the termination of parental rights."

**Id**. at 56-57 (citations and unnecessary capitalization omitted).

Subsection 2511(a)(2) provides that a trial court may terminate parental rights when:

[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). Under this subsection, the petitioner must show:

> (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

> Grounds for termination "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." Further, "[p]arents are required to make diligent efforts toward the **reasonably prompt** assumption of full parental duties."

*Interest of K.T.*, 324 A.3d at 57 (citations omitted and emphasis in original).

We emphasize: "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

In challenging termination under subsection 2511(a)(2), Mother argues CYF failed to prove she "has not remedied or cannot remedy the conditions that caused [Child] to be without essential parental care." Mother's Brief at 17. Mother avers:

> The conditions that led to [Child's] removal and placement were [his injuries.] Those injuries were suffered while [Child] was not in the care of Mother. CYF failed to prove any repeated and continuous incapacity, abuse, neglect or refusal by Mother. There was no evidence of any mental health condition or disorder

- 20 -

preventing Mother from providing essential parental care to [Child]. There was no evidence that Mother lacked the capacity to protect [Child] from risk of injury posed by others.

Mother is permitted to have unsupervised visits with an older sibling[,] and CYF filed a motion in June 2023 requesting Mother have unsupervised visits with [Child]. Despite the [trial] court not granting that motion, it clearly demonstrated that CYF had no concerns of Mother's ability to care and protect [Child].

*Id*. at 17-18 (*citing* N.T., 3/15/24, at 118). Mother further contends that

"[t]he trial court did not identify facts relied upon to find CYF met its burden

of proof under 23 Pa.C.S. § 2511(a)(2)." *Id*. at 18.

In its opinion, the trial court summarized that when Child was removed

from Parents' care the second time, in April 2021, CYF recommended that

Mother continue mental health treatment and medication management,

complete a parenting program, and have supervised visitation. Trial Court

Opinion, 4/5/24, at 4. Subsequently, CYF added goals of housing and alcohol

and drug abuse treatment. The trial court then cited the evidence that: (1)

Mother "was a no-show for" nine of ten drug screens, and on the tenth "screen

she was positive for THC [*sic*];" (2) although Mother was "consistent with her

mental health treatment, . . . she continue[d] to have issues," and she

"stopped taking her medication and was substituting with her own

unprescribed marijuana use;" (3) after Mother was forced to leave the

paternal grandfather's home, she "moved around quite a bit" and did not have

housing; (4) aside from "a very brief period," Mother "has remained

unemployed for the duration of her involvement with CYF;" and (5) while

Mother generally remained in contact with CYF, "there was a period from October . . . through mid-November, 2023, where CYF did not have contact with" her. Trial Court Opinion, 4/5/24, at 4-5.

The trial court also considered the following testimony by Caseworker Sprague. Visits between Mother and Child "went well," Child was attached to Mother, but her visits were inconsistent. "Mother was not currently in a position to economically support herself or meet her own needs, much less the special needs of" Child. *Id*. at 6. "Mother would initially be very compliant with court orders, [but] her par[t]icipation would eventually become sporadic which would lead to her being discharged from the various programs due to her lack of involvement." *Id*. at 5. In support, the trial court also cited the testimony of the several service providers, including Mercuri, Mother's clinical social worker. *See id*. at 6-7.

Furthermore, the trial court summarized Mother's own testimony, including her acknowledgement of: Father's abuse of Child; her alcoholism; her financial and phone problems, which prevented her from completing the POWER alcohol treatment recommendations; her hope to "get[] into the HOPE Center [housing] in approximately one month;" and her belief that if she had employment and housing, she could meet Child's needs. Trial Court Opinion, 4/5/24, at 7-8. Finally, the trial court considered the undisputed testimony that Foster Mother, who has cared for Child "since he was only a few months

old," met all of Child's "special needs and services," and that Child had a bond with her. *Id*. at 4.

After our review, we determine the trial court's findings of fact are supported by the record, and it did not commit any abuse of discretion. *See Interest of K.T.*, 324 A.3d at 56. Mother's argument infers that Father's abuse of Child was the sole issue necessitating Child's placement. Her discussion ignores, however, that even before Child was removed from the home the second time at two and one-half months old, the trial court had adjudicated him dependent and directed that his return to Parents' care be accompanied by in-home services. Additionally, Mother does not address her family plan goals of mental health and alcohol and drug treatment, medication management, parenting courses, supervised visitation, housing, and employment. Mother wholly ignores the trial court's discussion that although she completed services provided in-home, she failed to consistently follow through with multiple other services, including visitation with Child, and as a result she was unsuccessfully discharged from several programs. Mother does not dispute that over three years, she has not obtained any permanent housing or stable employment, nor complied with any drug or alcohol treatment beyond initial phone screenings. Any discrepancy between the testimony of Mother and CYF's witnesses, including Mother's reasons for missing appointments, were for the trial court to resolve. Finally, contrary to Mother's claim that "[t]here was no evidence that [she] lacked the capacity to

protect [Child] from risk of injury posed by others[,]" Mother's Brief at 18, Dr. Bernstein clearly testified as to his concern that Mother did not properly investigate the background of M.S., who would presumably be in a caregiver position if Child were returned to Mother's care. **See** N.T., 3/15/24, at 35-36.

We reiterate that Child has been in placement for his entire life, aside from two months when he was two and one-half months old. Mother does not dispute that she failed to consistently comply with her parenting goals, and indeed, at the hearing acknowledged that given her lack of housing and employment, she could not currently meet Child's needs. **See id**. at 57 (stating that "[g]rounds for termination 'are not limited to affirmative misconduct, but [also] parental incapacity that cannot be remedied," and that "[p]arents are required to make diligent efforts toward the ***reasonably prompt*** assumption of full parental duties"); ***see also In re B., N.M.***, 856 A.2d at 855 (stating that "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform . . . parental responsibilities while others provide the child with his . . . physical and emotional needs").

In light of all the foregoing, we determine the trial court did not abuse its discretion in finding CYF presented clear and convincing evidence that Mother's conduct satisfied the grounds for termination under subsection 2511(a)(2). ***See Interest of K.T.***, 324 A.3d at 56. We thus conclude no relief is due on Mother's first issue.

Because we agree with the trial court as to subsection 2511(a)(2), we need not reach the merits of Mother's second and third issues, which challenge termination under subsections 2511(a)(5) and (8). ***See id***.; ***see also In re B.L.W.***, 843 A.2d at 384.

In her final issue, Mother asserts the trial court abused its discretion in finding grounds for termination under subsection 2511(b). We reiterate that we review a termination decree for an abuse of discretion. ***See Interest of K.T.***, 324 A.3d at 56. As noted above:

> Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subsection] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Id***.

> Subsection 2511(b) states:
>
> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S.A. § 2511(b).

> [A] court conducting the [subs]ection 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of

- 25 -

whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

*Interest of K.T.*, 324 A.3d at 55 (citation omitted). "'In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.' The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well." *In re M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019) (citations omitted).

Mother avers "the trial court did not identify [the] facts relied upon to find CYF met its burden of proof under" subsection 2511(b), aside from stating that Child "is bonded to Mother and to the caregivers and that severing the bond with Mother 'would have an adverse impact upon [C]hild.'" Mother's Brief at 25. Mother contends:

Termination of [her] parental rights would not only deprive [Child's beneficial relationship with [her] but also would terminate the relationship [Child] has with a sibling and other members of the biological family. Even CYF expressed its hope that [Child] and a sibling could have stayed together in the same foster home.

The record shows [Child] is beneficially attached to Mother and derives invaluable and irreplaceable benefits from his relationship with Mother and biological family. [Child] deserves to have the benefits of those relationships preserved. The only way to ensure this benefit to [Child] is to restore Mother's parental rights.

*Id*. at 26-27.

In its opinion, the trial court stated that it considered Child's developmental, physical, and emotional needs and welfare. It found:

- 26 -

> The decision to terminate the parental rights of Mother in this case are based upon [C]hild's needs[,] projected development of his physical and emotional needs[, and] his welfare. [C]hild is in a pre-adoptive foster home and clearly has a strong bond with Foster [Mother.] Even though[ C]hild . . . has a bond with . . . Mother such that severing that bond would have an adverse impact upon [C]hild, nevertheless, severing that bond would be in the best interests of [C]hild, pursuant to [subsection] 2511(b).

Trial Court Opinion, 4/5/24, at 12.

After our review, we determine the trial court's findings of fact are supported by the record, and it did not commit any abuse of discretion. *See Interest of K.T.*, 324 A.3d at 56. Although the trial court did not cite detailed facts in the above analysis, we do not ignore the discussions, elsewhere in its opinion, that although Mother's visits with Child generally went well, Mother was inconsistent in her attendance. *See* Trial Court Opinion, 4/5/24, at 4, 5, 6. Relatedly, we emphasize that Mother does not address, let alone dispute, the relevant evidence presented by CYF. Caseworker Sprague believed that termination would best serve Child's needs and welfare. *See* N.T., 3/15/24, at 102-03. Additionally, CYF's expert, Dr. Bernstein, conducted bonding assessments and testified that he, too, observed a bond between Mother and Child, and that Mother provided Child with attention and affection. *See id.* at 41-42. Importantly, however, Dr. Bernstein also stated that Child did not rely on Mother "in terms of his everyday needs." *Id*. at 48. As stated above, he opined: "Given that [M]other's attendance in visits has been less than predictable and that her time with [Child] has . . . been restricted and limited, [he] did not view that [C]hild is dependent on [M]other in any meaningful way

such that he would be traumatized if that contact ceased." *Id*. at 47. To the extent the trial court credited this testimony, over Mother's testimony that termination was *not* in Child's best interest, *see id*. at 223, we do not disturb the court's weighing of the eivdence. *See Interest of K.T.*, 324 A.3d at 56.

In light of the foregoing, we determine the trial court's findings of fact are supported by the record evidence. *See id*. (stating that the presence of a parental bond "is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare").

In sum, we do not disturb the order of the trial court terminating Mother's parental rights to Child.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

12/3/2024

- 28 -